**ONTI, INC., et al., Plaintiffs,**

v.

**INTEGRA BANK, et al., Defendants.**

**A. Jerome DiGiacobbe, Jr., et al., Counterclaimants,**

v.

**ONTI, Inc., et al., Counterclaim Defendants.**

**Consolidated C.A. No. 14514.**

Court of Chancery of Delaware, New Castle County.

Submitted: May 11, 1999.
Decided: May 26, 1999.
As Revised: July 1, 1999.

Robert J. Valihura, Jr., and Thomas P. Preston, of Duane, Morris & Heckscher LLP, Wilmington, Delaware, for Plaintiffs and Counterclaim Defendants ONTI, Inc. and EquiMed, Inc.

Kenneth J. Nachbar, of Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware; of Counsel: Iles Cooper, of Williamson, Friedberg & Jones, Pottsville, Pennsylvania, for Counterclaim Defendants Douglas R. Colkitt, M.D., Jerome D. Derdel, M.D. and Raymond J. Caravan.

R. Franklin Balotti and Anne C. Foster, of Richards, Layton & Finger, Wilmington, Delaware; of Counsel: Jefferson V. Wright, Robert S. Brennen, and Matthew S. Sturtz, of Miles & Stockbridge P.C., Baltimore, Maryland, for Defendants, Counterclaimants and Petitioners.

Josy W. Ingersoll and Martin S. Lessner, of Young Conaway Stargatt & Taylor, LLP, Wilmington, Delaware; of Counsel: Peter S. Russ, of Buchanan Ingersoll Professional Corporation, Pittsburgh, Pennsylvania, for National City Bank of Pennsylvania, f/k/a Integra Bank.

## OPINION

CHANDLER, Chancellor.

This is an appraisal and entire fairness action arising from the cash-out mergers (the "Cash–Out Mergers") of Onco–Tech, Inc. ("OTI") and eight other companies that owned cancer treatment facilities (the "Eight Centers"). I must decide the value of the companies at the time of the mergers.

### I. BACKGROUND

On January 31, 1986, Mobil Diagnostic, Inc. ("MDI"), a company owned by A. Jerome DiGiacobbe, Jr. ("DiGiacobbe"), Calvin F. Zontine, and Gerald W. Weaver (collectively the "Individual Counterclaimants," and with MDI, the "Counterclaimants"), entered into a joint venture with Oncology Services, Inc. ("OSI"), a company wholly owned by Douglas R. Colkitt ("Colkitt") (together with Jerome D. Derdel ("Derdel"), and Raymond J. Caravan ("Caravan"), and with OTI, EquiMed, Inc., EquiVision, Inc., and the Treatment Center Companies (defined below)), (the "Counterclaim Defendants"). Conflicts developed between the parties to the venture, and they entered a consent decree (the "Consent Decree") on January 31, 1988. Pursuant to the Consent Decree, fifteen cancer treatment centers were transferred to OTI, a company owned sixty percent by Colkitt and forty percent by the Individual Counterclaimants.

In 1993, assets of ten of these fifteen cancer treatment centers were transferred in exchange for stock in ten new companies (the "Treatment Center Companies"), and the stock was distributed to OTI's shareholders. Pursuant to a writ of garnishment, OTI, either correctly or incorrectly (depending on which side tells the story—it is not important to this decision),

issued the Counterclaimants' shares to Integra Bank ("Integra").

On August 30, 1995, OTI and the Eight Centers (of the ten Treatment Center Companies) completed the Cash–Out Mergers. The Counterclaimants' forty percent interest was determined to be worth $6,040,000, based on a valuation performed by Hempstead & Co., Incorporated (the "Hempstead Valuation").[1] ONTI, Inc. ("ONTI") was the surviving company in the OTI Cash–Out Merger, and the Eight Centers were survived by the New Treatment Companies. Subsequently, the New Treatment Companies merged with Colkitt Oncology Group ("COG"), a company owned primarily or entirely by Colkitt, and COG subsequently (in February 1996) merged with EquiVision, Inc. ("EquiVision"), a public company owned thirty percent by Colkitt, resulting in EquiMed, Inc. ("EquiMed"), a public company (the "EquiMed Transaction"). (I will address further details of the background to the transaction as necessary in the analysis below.)

The case was originally filed by ONTI and the New Treatment Companies (collectively, "Plaintiffs") against the Individual Counterclaimants and Integra (collectively, "Defendants"), seeking a declaration that the Cash–Out Merger consideration of $6,040,000 was entirely fair to the minority stockholders and a declaration as to who were the proper parties entitled to receive the consideration in the Cash–Out Mergers or to demand appraisal. Counterclaimants later filed counterclaims against the Counterclaim Defendants alleging unfair dealing and breach of contract, as well as

appraisal actions against ONTI and the New Treatment Companies, seeking approximately $53 million for their share of the Eight Centers. Integra Bank also filed appraisal actions against the New Treatment Companies, but not against ONTI. The Court tried these actions on a consolidated basis between May 11 and May 28, 1998.

## II. APPRAISAL CLAIM

The parties disagree about virtually everything in this case, a circumstance that complicates my effort to resolve this matter. Based on Counterclaimants' reliance on it in their post-trial brief, however, I believe I can base my appraisal of the companies on the Hempstead Valuation, modifying it where appropriate by the primary adjustment claims asserted by Counterclaimants.

### A. Law of an Appraisal Case

■ The focus of an appraisal proceeding is not a wide one: "[I]n a section 262 appraisal action, the only litigable issue is the determination of the value of the appraisal petitioners' shares on the date of the merger, the only party defendant is the surviving corporation and the only relief available is a judgment against the surviving corporation for the fair value of the dissenters' shares."[2] Therefore, I will focus on the methods and data relied upon by the parties to arrive at their calculations of the fair market value of the shares cashed-out in the Cash–Out Mergers, "and the extent to which the expert witnesses, their methods, and their sources of information" affect the accuracy of those calculations.[3]

1. The Hempstead Valuation of Aug. 29, 1997, PX 313, summarized into one report Hempstead's actual appraisals performed on August 22, 1995, on each of the Eight Centers. It also (and separately) updated those appraisals "to reflect actual performance during the first two years of the projection period," Hempstead Valuation at 1, but all references in this Opinion to the Hempstead Valuation are to the summarized portions of the appraisals and not to those updated numbers.

2. Cede & Co. v. Technicolor, Inc., Del.Supr., 542 A.2d 1182, 1187 (1988).

3. Grimes v. Vitalink Communications Corp., Del.Ch., C.A. No. 12334, 1997 WL 538676, Chandler, C. (Aug. 28, 1997), Mem. Op. at 4, aff'd, Del.Supr., 708 A.2d 630, and cert. denied, 525 U.S. 867, 119 S.Ct. 160, 142 L.Ed.2d 131 (1998); see also Rapid–American Corp. v. Harris, Del.Supr., 603 A.2d 796, 802 (1992) ("[T]he trial judge, as finder of fact in

### B. Counterclaimants' Objections to the Hempstead Valuation

In determining the value of the shares to be appraised, the Hempstead Valuation considered three methods: a Market–Based Approach, an Earnings–Based Approach, and an Asset–Based Approach. Ultimately it decided on the Earnings–Based Approach for its final valuation.[4] Richard Ruback ("Ruback") analyzed the Hempstead Valuation for Counterclaimants and made several adjustments.[5] For simplicity's sake, I base my analysis on the structure employed by Ruback in reviewing the Hempstead Valuation.

### 1. Stock Market Value

Ruback first calculated the fair value of the Eight Centers looking at the market price of EquiVision on the date of its announced merger with COG.[6] The Hempstead Valuation vehemently objects to this approach, saying "the EquiMed transaction [i.e., the merger of EquiMed with COG] provides no relevant information which would affect our analysis of the fair value of the Cancer Centers as of August 22, 1995."[7] Its reasoning is that even if this Court were to factor in the value of the EquiMed stock, adjustments must be made because "the shares of common stock in EquiMed issued in the EquiMed Transaction to COG's shareholders were restricted shares, and such shares must be valued, if at all, in a manner reflecting the reality of the lack of immediate marketability of those shares."[8]

Ruback's valuation looks at two separate market prices, the closing price of EquiVision on September 7, 1995, the first trading day after it announced its plan to merge with COG ($7.125, adjusted to $14.25 based on a subsequent 1 for 2 reverse stock split), and the closing price of EquiMed on February 5, 1996, the first trading day after the merger of EquiVision and COG and the creation of EquiVision ($15.50). Ruback, noting that these values were consistent, took the smaller of them (perhaps to be conservative)—the $14.25 on the day of the announcement—and multiplied it by the 20,783,633 adjusted shares of EquiMed that COG shareholders would receive in the merger, to arrive at a valuation of $296.2 million. Then he multiplied that amount by the value of the Eight Centers compared to all of COG—31.7%[9] —and that by the Counterclaimants' 40% share to arrive at a value of $93.9 million for the value of the EquiMed shares that Counterclaimants would have owned had they not been cashed out.

As mentioned above, Counterclaim Defendants' (and the Hempstead Valuation's)

appraisal cases, enjoys the unique opportunity to examine the record and assess the demeanor and credibility of witnesses."); *Alabama By-Products Corp. v. Neal*, Del.Supr., 588 A.2d 255, 258 (1991) ("Where those assumptions [underlying expert valuations] are values supplied by others, the conduct of such other persons is probative of their credibility and of the information being supplied to the expert.").

4. *See* Hempstead Valuation at 54–62.

5. *See* Report of Richard Ruback, July 25, 1997, DX 517 *et seq.* (hereinafter, "Ruback Report"). Since 1988, Richard Ruback has been on the faculty of the Harvard Graduate School of Business and is currently the Willard Prescott Smith Professor of Corporate Finance at that school. Prior to that he taught finance at Sloan School of Management at the Massachusetts Institute of Technology for seven years. He has also served as the Director of Research at HBS and as a Research Associate for the National Bureau of Economic Research.

6. *See id.* at 6.

7. Hempstead Valuation at 8.

8. *Id.*

9. Ruback looked at the Eight Centers' revenue, earnings before interest, taxes, depreciation, and amortization ("EBITDA"), and earnings before interest and taxes ("EBIT") for the year ended December 31, 1995, as a percentage of the same figures for COG that same year, then added them up (29.3%, 33.1%, and 32.6%, respectively) and divided by three to arrive at his 31.7% average. *See* Ruback Report, ex. 4.

objection to this methodology is twofold: first, the EquiMed Transaction should not be considered at all, and second, if it is, the shares must be discounted to reflect their lack of marketability, based on the restricted nature of the shares. I now turn to these two objections.

### a. Section 262(h)'s Prohibition of Considering the Value Added by the Merger

■ Counterclaim Defendants urge me to exclude this methodology on factual grounds (the opportunity to combine COG with EquiVision was not available to OTI without the Cash–Out Mergers taking place) and on legal grounds (*Cede* [10] and related cases require the Court to value the company on a going concern basis, not including speculative hopes for future synergies or earnings). Regarding the factual claim, Counterclaim Defendants state that the president of EquiVision, Larry Pearson ("Pearson"), "was adamant that he would not do a transaction involving centers in which MDI or its principles continued to hold a minority interest." Therefore, say Counterclaim Defendants, two alternatives existed: either Counterclaimants remained minority shareholders and the EquiMed Transaction did not occur, or they were cashed out and it did.

But Counterclaimants point out the inconsistency between Pearson's deposition and trial testimony. Pearson reported this fact at trial, but in his deposition he stated, "I never said that, in fact, that if the cashout merger did not occur, that the merger

transaction between COG and EquiVision would not have occurred. I did not say that." [11] In his deposition, Colkitt also testified concerning the Cash–Out Mergers, "I don't think they were necessary to do the merger with EquiVision." [12] Looking at these two statements, and considering the relation between Colkitt and EquiVision—he was the chairman of its board of directors and owned thirty percent of the company—I cannot find credible the claim that Pearson told Colkitt he would not do the merger without the Cash–Out Mergers taking place. As a result, I reject Counterclaim Defendants' factual basis for why the Court cannot consider the EquiMed Transaction.

Regarding the legal basis, Counterclaim Defendants cite section 262(h) of the Delaware General Corporation Law [13] as well as several Delaware cases that require in an appraisal action that this Court consider only the value of a company as it existed at the time of the merger, and not its value "in the hands of a potential acquiror, or any other value." [14] Specifically, Counterclaim Defendants cite to *Chicago Corp. v. Munds*, [15] *Tri–Continental Corp. v. Battye*, [16] *Application of Delaware Racing Association*, [17] *Bell v. Kirby Lumber Corp.*, [18] and *Cede & Co. v. Technicolor, Inc.* [19] These cases all do stand, more or less, for the proposition that in an appraisal proceeding, a corporation must be valued "as an operating entity by application of traditional value factors, weighted as required, but without regard to post-merger events

---

**10.** *Cede & Co. v. Technicolor, Inc.*, Del.Supr., 684 A.2d 289 (1996).

**11.** Dep. of Larry W. Pearson, Nov. 20, 1996, at 143–44.

**12.** Dep. of Douglas R. Colkitt, Apr. 4, 1997, at 383–88.

**13.** 8 *Del. C.* § 262(h) ("[T]he Court shall appraise the shares, determining their fair value exclusive of any element of value arising from the accomplishment of the merger or consolidation ....").

**14.** Countercl. Defs.' Post–Tr. Br. at 43.

**15.** Del.Ch., 172 A. 452 (1934).

**16.** Del.Supr., 74 A.2d 71 (1950).

**17.** Del.Supr., 213 A.2d 203 (1965).

**18.** Del.Supr., 413 A.2d 137 (1980).

**19.** Del.Supr., 684 A.2d 289 (1996).

or other possible business combinations." [20]

As Counterclaimants point out, however, that is not the whole story. Even the Counterclaim Defendants acknowledge that *Cede*'s meaning has been hotly debated since it was issued by the Supreme Court.[21] They quote the following colloquy in one of these debates:

MR. [DAVID C.] MCBRIDE: Let me ask you this: Would we all agree that if a synergistic non-speculative contract between the acquirer and the target is one that won't occur but for the merger, the value will not be considered in the appraisal?

MR. [JESSE A.] FINKELSTEIN: You could even go so far as to make it conditioned on the merger. Say this becomes effective the moment you become the 100 percent owner.

MR. [A. GILCHRIST] SPARKS: Signed and binding. I would agree with Dave [McBride], that's excludable.

MR. MCBRIDE: Even though the prospect of the contract affects the present value of the present business before the merger. In other words, an investment banker might come in and say this business was worth more because if the merger occurs, this is going to happen.

MR. SPARKS: Yes.

MR. FINKELSTEIN: That ought to be the fair flip side of this strict bright line that we've been talking about in *Technicolor*. If the fact that it happens a second in time before makes it includable, certainly then having it happen a second afterwards should make it excludable under a statute that excludes "any element of value arising from the accomplishment or expectation of the merger." [22]

The record in this case, however, is not as clear as Counterclaim Defendants would make it seem as to whether the EquiMed Transaction would not occur without the Cash–Out Mergers. Indeed, I have determined that that fact was *not* certain, so I do not believe Counterclaim Defendants' argument above applies here.

Furthermore, even if I had not so determined, *Cede* would not bind the Court to a finding that the EquiMed Transaction may not be considered in this appraisal. *Cede* requires the Court to consider "[a]ll 'elements of future value, including the nature of the enterprise, which are known or susceptible of proof as of the date of the merger and not the product of speculation ....' " [23] Looking at the ownership of the companies involved, I think it is clear that it is "not the product of speculation" that the EquiMed Transaction was effectively in place at the time of the Cash–Out Mergers, as *Cede* requires. In fact, the same symposium relied on by Counterclaim Defendants in support of their interpretation of *Cede* actually supports the opposite conclusion. Specifically, I consider the following comment regarding a hypothetical company that owns "a large cornfield in the middle of Manhattan roughly where something like Citicorp Center presently sits": [24]

Let's suppose that you are the minority owner in the company that owns the cornfield and the majority stockholder and the members of the board say to themselves, boy, we really are underutilizing this asset. We ought not utilize this as a cornfield. The company is only selling at about $1 per share. We can buy it at approximately that price and subdivide it or develop it and build

**20.** *Cavalier Oil Corp. v. Harnett,* Del.Supr., 564 A.2d 1137, 1144 (1989).

**21.** *See, e.g.,* Symposium: *Delaware Appraisals after* Cede & Co. v. Technicolor, 17 Bank & Corp. Governance L. Rep. 631 (1996) (transcribing a discussion among five noted Delaware corporate lawyers about the implications of the *Cede* holding).

**22.** Countercl. Defs.' Br. at 41–42, quoting Symposium, *supra* note 21, at 651–52.

**23.** *Cede,* 684 A.2d at 300.

**24.** *See* Symposium, *supra* note 21, at 633.

buildings on it and sell those buildings or rent those buildings.

And the majority stockholder says to himself, yes, that's a great idea. Let's freeze out the minority. I'm going to capture all of that value for myself. And there's a freeze-out at a price that values the company by the majority stockholder at a price that reflects nothing but the value of that property as a cornfield.

I would suggest to you that a valuation of that company as of the date of the merger that doesn't take into consideration the nonspeculative possibilities of developing this cornfield into something other than a cornfield is not a realistic valuation of the company. The minority shareholders, under those circumstances, are entitled to a valuation that reflects the value of a company that owns a cornfield that can be developed into a major office center.[25]

This hypothetical is instructive here. Colkitt is the majority stockholder, OTI (and later, ONTI) is the company, the Eight Centers are the cornfield, and the plan to develop the cornfield (the Eight Centers) is the plan to merge COG with EquiVision. Through his position as chairman of EquiVision (superior to Pearson's position as president) and his thirty percent ownership of EquiVision, Colkitt had the ability to make sure the Cash–Out Mergers occurred.[26]

Therefore, *Cede* actually interprets § 262(h)'s command to appraise the shares "exclusive of any element of value arising from the accomplishment or expectation of the merger"[27] in such a way as to favor the valuation of the company offered by Counterclaimants, not as offered by Counterclaim Defendants. Accordingly, I believe I must consider the EquiMed transaction when valuing the shares at issue.[28]

### b. Consideration Given to Restricted Nature of Shares

■ Counterclaim Defendants next argue that if this Court does consider the market value of EquiMed stock, it must discount the value of the shares Counterclaimants would have received because they would be restricted in their ability to sell the shares. Counterclaimants contend that *no* discount should be applied to the restricted shares, for two reasons: First, Counterclaim Defendants have made no showing of what restrictions are on the stock, so it would be impossible to determine what discount should apply, and second, "adjustments to remove the minority discount implied in the market price for the stock could have the effect of completely canceling out any discount that

---

**25.** *Id.* at 638.

**26.** Although Counterclaim Defendants insist that "the actual merger agreement was negotiated, primarily between Mr. Pearson and Dr. Colkitt, in arms-length, and sometimes acrimonious negotiations," Countercl. Defs.' Post–Tr. Br. at 30, I cannot believe that there was a possibility of the merger *not* going through, based, as I have stated, on the significant ownership of and position in EquiVision that Colkitt maintained. The prospect that the negotiations were "acrimonious," when they were between the president (Pearson) on the one side and the 30% owner and chairman (Colkitt)—who had a significant say in the president's continuing employment—on the other side, hardly seems likely. In fact, I do not find the testimony supporting this argument to be credible. (Counterclaimants report Colkitt owned 27% of EquiVision, while Counterclaim Defendants report his share was 30%, Countercl. Defs.' Post–Tr. Br. at 29. My decision to cite the latter figure does not affect my findings in any way.)

**27.** 8 *Del. C.* § 262(h).

**28.** *Cf.* John C. Coffee, Jr., *Transfers of Control and the Quest for Efficiency: Can Delaware Law Encourage Efficient Transactions While Chilling Inefficient Ones?*, 21 Del. J. Corp. L. 359, 418 ("Although the idea [of excluding elements of value arising from the accomplishment or expectation of the merger] makes some sense in the arm's-length transaction where the dissenting shareholder is truly opting out, it is misapplied in squeeze-outs where the shareholder is being expelled and where those who remain may be exploiting asymmetric information.").

might be applied by reason of the alleged restrictions."[29] I find both of these arguments unpersuasive, and I conclude instead that I must apply an appropriate discount to reflect the stock's limited alienability.

With regard to their first argument, Counterclaimants insist that Hempstead "was not sure what type of restrictions may have applied to Colkitt's stock," and "he never opined either during his testimony or in his 1997 Report on the extent of the discount, if any, that should be applied."[30] But restricted stock is restricted stock. SEC Rule 144[31] covers the sale of non-registered shares such as the ones issued in the EquiMed Transaction, and it includes provisions for so-called "leakage" (*i.e.*, how soon it can be sold and how much can be sold) that apply across-the-board to unregistered shares.[32] The Hempstead Valuation included analysis of how such a status affects stock prices, so I find Counterclaimants' argument here unpersuasive.

Turning to the second argument, Counterclaimants cite two Delaware cases— *Rapid-American Corp. v. Harris*[33] and *Kleinwort Benson Ltd. v. Silgan Corp.*[34]— to support their view that any discount for the restricted nature of the stock is offset by the effect of the control premium or minority discount this Court must adjust in the equation. In *Rapid–American*, the Supreme Court remanded an appraisal matter to this Court to recalculate the appraisal price per share, offsetting the control premium inherent in the majority shareholder's ownership that would suppress the market price of the publicly-traded minority shares. In other words, because the market ascribed a control premium to the privately-held majority ownership, it similarly ascribed a minority share discount to the publicly-traded shares, and therefore the Court of Chancery was directed to increase the appraised value to offset this minority share discount. Counterclaimants here argue that I should offset any possible discount for the restricted nature of the shares by this minority share discount and essentially "call it even."

In the first place, however, clearly this Court cannot make "call it even" assumptions unless it finds that things really are "even." Second, I do not believe there was a control premium inherent in the EquiMed stock price.[35] In fact, when EquiVision and COG merged, Colkitt's control decreased, based on his sixty percent ownership share (before the Cash–Out Mergers) in the latter being merged with the thirty percent ownership position he had in the former. I am skeptical that *Rapid–American* requires the Court to "back out" a control premium when control

29. Counterclaimants' Post–Tr. Br. at 106.

30. *Id.*

31. 17 C.F.R. § 230.144.

32. 17 C.F.R. § 230.144(d) & (e).

33. Del.Supr., 603 A.2d 796 (1992).

34. Del.Ch., C.A. No. 11107, 1995 WL 376911, Chandler, V.C. (June 15, 1995), Mem. Op. at 5–6.

35. In fact, the closing price of EquiVision stock *before* the announcement of the EquiMed Transaction was $7.21875, while on the day after the announcement the stock closed at $7.125. *See* Ruback Report at 6–7 and n.8. The fact that the stock price hardly moved after an announcement informing EquiVision shareholders that their company would merge with a much larger one, presumably leading to their owning a minority position in the new company, strongly suggests that no significant minority discount applies. If COG were gaining a control premium in EquiMed (and subsequently EquiVision shares were subject to a minority discount), certainly the stock would have dropped much more sharply. Even five months later, when EquiMed stock began trading, its price was $7.75 (on an adjusted basis), an *increase* from the price at which it traded before the new majority shareholder arrived. So despite Hempstead's statement at trial that certain studies have found a 30% minority discount (which would be $2.1375 in the case of EquiMed stock), I do not find that the need to back out a minority discount or control premium applies here.

is actually decreasing as a result of the transaction.[36]

*Kleinwort Benson Ltd. v. Silgan Corp.* provides further support for this analysis. In that case I noted that "[i]n prior appraisal actions, this Court has rejected the use of a control premium derived from merger and acquisition data because the control premium incorporates post-merger value."[37] In other words, this Court will make adjustments for the effect of a control premium when it depresses the market value of minority-owned shares, but it will not specifically consider studies of control premiums paid in merger transactions because those reflect expected future profits after the merger (*i.e.*, synergy values). Here, I decline to adjust for any control premium that may have been created by the EquiMed Transaction because that premium, if any, would result from synergies that were far from certain at the time of the EquiMed Transaction.

Additionally, in *Kleinwort Benson* the Court *did* offset for a control premium. In that case, however, plaintiffs argued with *specificity* what that premium was (ten to fifteen percent). Here, Counterclaimants have merely argued that it "could have the effect of completely canceling out any discount that might be applied by reason of the alleged restrictions," so

even if I could, as a matter of law, consider such a premium, I cannot determine what that premium would be because of the insufficiency of the record before me. In *Cavalier Oil Corp. v. Harnett*,[38] the Supreme Court authorized corporate level discounting but not shareholder level discounting—*i.e.*, if a stock discount affects the entire company, it should be considered in the appraisal, but if it only affects certain shareholders (such as a minority discount does), it should be eliminated by an upwardly adjusted market value. The *Cavalier Oil* Court found that a shareholder level discount "fail[s] to accord to a minority shareholder the full proportionate value of his shares [which] imposes a penalty for lack of control, and unfairly enriches the majority shareholders."[39] Here, however, the discount that results from the restrictions on the shares affects not just Counterclaimants but also Counterclaim Defendants. I consider it corporate level discounting and, therefore, appropriate.[40]

Since I find that the restricted shares must carry some discount from the market price of EquiMed stock, I now turn my attention to how much that discount should be. The Hempstead Valuation includes an exhibit with two summaries of studies performed on discounts applied to restricted stock.[41] The second of these summaries

---

**36.** Of course, this case is the exception. Ordinarily, control will be increasing in a cash-out merger or similar transaction that precipitates an appraisal proceeding. Here, because of the fact that I am considering for valuation not the post-Cash-Out Merger company (COG) but the subsequently merged company (EquiMed), in which any control premium is much smaller, that is not the case.

**37.** *Kleinwort Benson*, at 5.

**38.** Del.Supr., 564 A.2d 1137, 1144 (1989)

**39.** *Id.* at 1145. *But see* Coates, *"Fair Value" As An Avoidable Rule of Corporate Law: Minority Discounts in Conflict Transactions*, 147 U. Pa. L.Rev. 1251, 1266–87 (1999) [hereinafter, *"Coates: Fair Value"*] (criticizing *Cavalier Oil*'s pro rata value holding for its "inherent indeterminancy").

**40.** Even though the restrictions are not on the stock owned by the non-party public shareholders of EquiMed (specifically those who owned stock in EquiVision), it is clear that the rule in *Cavalier Oil* would consider the discount a corporate level discount because it affects all the shareholders involved in the Cash–Out Mergers. *Cf. Coates: Fair Value*, *supra* note 39, at 1272 n. 69 (discussing the rationale for marketability discounts in the appraisal context and pointing out that "New York courts have reasoned that if all outstanding shares of a corporation are equally unmarketable," it makes sense to consider that to be a " 'corporate-level' adjustment to the value of the firm itself").

**41.** Hempstead Valuation, ex. II (citing studies compiled in Shannon Pratt, et al., *Valuing a Business* 171 (3d ed.1996)).

compiles studies that examine "the price at which common shares in privately-held companies sold prior to subsequent public offerings of stock in the same company." In determining an appropriate discount to apply to the shares, I will not consider these studies—which have higher discounts than the other studies summarized—for three reasons: first, there was no indication that Counterclaimants would have sold their stock prior to a public offering (here, the EquiMed Transaction); second, twelve of the nineteen studies presented transactions up to three years prior to the public offering, so that for many of these transactions the possibility of a public offering was far more remote than the present matter; and third, the likelihood of the EquiMed Transaction occurring within a relatively short time was high, considering discussions were already well underway between Colkitt and Pearson at the time of the Cash–Out mergers.

Looking next at the restricted stock studies, the range of the mean discounts presented is from 23.0% to 35.6%. Three of the studies presented only median discounts, which were 31.2%, 33.5%, and 45.0%. I cannot determine that any of these studies are more or less correct than the others based on the information presented, and so I will average all of the mean discounts presented. I will not add in the median discounts, however, as it is elementary statistical knowledge that adding medians, and dividing by the number one has added, is neither a mean nor a median of the two groups.[42] Doing this simple calculation gives a mean discount among the eighteen remaining studies of 31.31%. As a result, I will discount the market value of the EquiMed stock on the date of the announcement of the EquiVision–COG merger,[43] $296.2 million (a slightly lower number than the price on the date of the EquiMed Transaction itself, and the one proposed by Counterclaimants), to reflect the restricted nature of the shares Counterclaimants and COG would have received.[44] This reduced amount is $203.46 million. As both parties agree

42. Counterclaim Defendants might object to this calculation, as the highest discount among all of the studies, 45.0%, is a median. I am comfortable leaving that study out, however, based on the fact that at 28 transactions studied, it was the smallest of the studies, and perhaps the most prone to be wrong as a result. In any case, performing the calculation with the three medians included only decreases the market price valuation by $600,000, to $25.2 million. See Hempstead Valuation, ex. II at 2.

43. See Tannetics, Inc. v. A.J. Indus., Inc., Del. Ch., C.A. No. 5306, Marvel, C., 5 Del. J. Corp. L. 337, 348, 1979 WL 2700 (July 17, 1979) ("For appraisal purposes, the market price for stock subject to an appraisal as here is that which existed immediately prior to the formal announcement of an intention to merge."); In re Olivetti Underwood Corp., Del. Ch., 246 A.2d 800 (1968); Levin v. Midland–Ross Corp., Del.Ch., 194 A.2d 50 (1963).

44. COG received ⅚ of the shares of EquiMed in the EquiMed Transaction; these shares, however, were restricted and unregistered, and·so they were not worth the same amount per share as the. unrestricted, registered shares of EquiMed that the EquiVision shareholders received in that transaction. The 31.31% discount is the amount I have determined to be that discount. In an appraisal, I must determine the value of the company as a whole, and then give the plaintiff his share of that company. On the date the EquiMed Transaction was announced, EquiVision shares traded at $7.125. Based on the discount I found, the market value of each share received by COG's shareholders was (1—.3131) × $7.125, or $4.8942. A total of 49,880,718 shares of EquiMed (adjusted for a subsequent split) were issued. COG's shareholders received ⅚ of them, or 41,567,265 shares, and EquiVision's shareholders received ⅙ of them, or 8,313,453 shares. So the market value of EquiMed was ($7.125 × 8,313,453 shares—EquiVision's portion) + ($4.8942 × 41,567,265 shares—COG's portion), or $262,671,861. The former COG shareholders' adjusted ownership, then, was $203.4 million, or 77.45% (calculated as $4.8942 × 41,567,265 / $262,671,861).

Thus, I find, as a matter of law, that I must discount the EquiMed shares received by the former COG shareholders (including those the Counterclaimants would have received), as they were not as valuable as the unrestricted shares. Had the former COG shareholders received registered, unrestricted shares, I find—as a matter of fact and based on the record before me—that they would have re-

that COG made up 31.7% of EquiMed after the merger, the COG stock was worth $64.50 million, and Counterclaimants' 40% share of that equals $25.80 million.

▮ Finally, I address one more comment by Counterclaim Defendants, specifically, that I should take into account the actual performance of the stock in the two years *after* the EquiMed Transaction, the period during which all of the stock allegedly was restricted. I reject this assertion for two reasons. First, the stock value in the future does not matter because shares are to be valued as of the date of the merger.[45] Second, the stock was not *entirely* inalienable; rather, it could not be sold to the *public*. But unregistered shares may be sold in *private* transactions, and the whole reason for discounting the stock price is to factor in this limited market for the shares. As a result, Counterclaimants could have sold their shares on the day of the EquiMed Transaction and avoided the drop in stock price, but they would have been able to sell them only for below market value—and that is why I have applied a discount in the first place. Accordingly, the value assigned to the shares on the date of the merger using market price is $25.80 million.

### 2. *Comparative Analysis*

Next, Ruback considered the Hempstead Valuation's failure to do a market comparison to determine the value of EquiMed and the cashed-out shares. The comparative analysis approach, also called a comparable companies approach, seeks to value a company based on first finding companies that are similar to the company under appraisal and then "calculat[ing] the value of the company through the use of earnings and other multiples."[46] This Court has used this approach as one method for properly valuing a company.[47]

The Hempstead Valuation stated that the publicly-traded physician practice management ("PPM") companies it identified all "were larger in size and had significantly higher expected growth rates."[48] Furthermore, "as a result of a consent decree, the [Eight] Centers were not growing from acquisitions or opening any new locations ... [and] their expected growth rates were much lower than the publicly-traded PPM companies,"[49] so the Hempstead Valuation concluded no comparison was appropriate.

Ruback, on the other hand, believed that he found two comparable companies, Physician Reliance Network ("PRN") and American Oncology Resources ("AOR"), both of which are publicly-traded PPMs specializing in oncology. He looked at the two companies' estimated 1995 revenue multiples, EBITDA multiples, and EBIT multiples, and applied those numbers to

---

ceived fewer shares. COG and EquiVision, in their negotiations, must have arrived at some understanding of the value that each would bring to their successor in interest, EquiMed. That value must have been translated into both the percentage ownership and actual number of shares that COG would have in EquiMed. Because the value of that ownership share was not directly presented to me by the parties, I was forced to calculate it based on the evidence presented. The only evidence presented on restricted stock discounts was that offered in the Hempstead Valuation, which I have used. Therefore, I find that the market valuation of EquiMed was $262,671,861, and the former COG shareholders' percentage of that was 77.45%.

**45.** *See, e.g., Cede & Co. v. Technicolor, Inc.,* Del.Supr., 684 A.2d 289, 300 (1996) ("[T]he

Court of Chancery's task in an appraisal proceeding is to value what has been taken from the shareholder, *i.e.,* the proportionate interest in the going concern.").

**46.** *In re Radiology Assocs., Inc. Shareholder Litig.,* Del.Ch., 611 A.2d 485, 489 (1991); *see also Harris v. Rapid–American Corp.,* Del.Ch., C.A. No. 6462, 1990 WL 146488, Chandler, V.C. (Oct. 2, 1990), Mem. Op. at 19.

**47.** *See, e.g., Radiology Assocs.,* 611 A.2d at 489; *Rapid–American* at 21.

**48.** Hempstead Valuation at 54.

**49.** *Id.* at 54–55.

the *adjusted* 1995 revenue of the Eight Centers to arrive at a range of equity value (after subtracting out the $4.7 million of interest-bearing debt outstanding) for the Eight Centers of $84.7 million to $136.4 million.

Counterclaim Defendants have numerous objections to this approach. First, they claim that the two companies selected are not comparable, comparing the present analysis to that in this Court's opinion in *In re Radiology Associates, Inc. Litigation,* in which I held that the comparable companies were really not comparable at all and disregarded this form of analysis.[50] Counterclaim Defendants further believe that PRN and AOR are not comparable because they also perform medical oncology, which is far less equipment intensive than radiation oncology, the only type performed by the Eight Centers, and because they derive significant amounts of revenues and profits from pharmaceuticals. Both of these facts make the financials of these two companies significantly different from those of the Eight Centers, according to Counterclaim Defendants.

■ The burden of proof on the question whether the comparables are truly comparable lies with the party making that assertion, here the Counterclaimants.[51] Without commenting on the validity of Counterclaim Defendants' other objections to the comparative analysis performed by Ruback, I agree with Counterclaim Defendants that the companies are not comparable. As in *Radiology Associates,* I find PRN and AOR sufficiently different from the Eight Centers as to make any meaningful comparison impossible, so I ignore this approach in my appraisal of the fair value of the Eight Centers.

### 3. Discounted Cash Flow Analysis

■ The third approach Ruback used in his valuation, and the only method used in the Hempstead Valuation, was a discounted cash flow analysis. While no method of valuation is preferable *per se* in Delaware, since the abolishment of the Delaware Block method for appraisals in 1983,[52] this Court frequently has employed the discounted cash flow as at least one method of valuation.[53]

**50.** Del.Ch., 611 A.2d 485 (1991). Specifically, Counterclaim Defendants note that the comparison here is even more skewed than that in *Radiology Associates:*

*Radiology Associates*

| | Radiology Assoc. | Comp. 1 | Comp. 2 |
|---|---|---|---|
| Revenues | $8.4 million | $28.2 million | $187.7 million |
| Revenue Growth | 7.2% | 35.5% | 38.2% |
| Earnings Growth | 10.4% | 13.4% | 34.4% |

*Eight Centers*

| | Eight Centers | PRN | AOR |
|---|---|---|---|
| Revenues | $11.8 million | $137.3 million | $99.1 million |
| Revenue Growth* | –0.8% | 69.4% | $185.9% |
| Earnings Growth | 0.7% | 72.5% | Not Meaningful |

* Based on actual data for 1992–94 and estimates for 1995, adjusted for 1994 contractual change.

**51.** *See Gilbert v. M.P.M. Enters., Inc.,* 709 A.2d 663, 671 (1997) ("It is petitioner's burden to demonstrate the reasonableness of the comparables selected by its expert in the performance of his analysis.").

**52.** *See Weinberger v. UOP, Inc.,* Del.Supr., 457 A.2d 701, 713 (1983) (determining the Delaware Block approach was too rigid and requiring this Court to allow proof of value "by any techniques or methods which are generally considered acceptable in the financial community and otherwise admissible in court").

**53.** *See, e.g., In re Radiology Assocs., Inc. Litig.,* Del.Ch., 611 A.2d 485 (1991); *Cede & Co. v. Technicolor, Inc.,* Del.Ch., C.A. No. 7129, 1990 WL 161084, Allen, C. (Oct. 19, 1990); *Neal v. Alabama By–Products Corp.,* Del.Ch., C.A. No. 8282, 1990 WL 109243, Chandler, V.C. (Aug. 1, 1990), Mem. Op. at 16 (noting that experts consider the discounted cash flow method to be the preeminent method of valuation); *Cavalier Oil Corp. v. Harnett,* Del.Ch.,

The DCF model entails three basic components: an estimation of net cash flows that the firm will generate and when, over some period; a terminal value equal to the future value, as of the end of the projection period, of the firm's cash flows beyond the projection period; and finally a cost of capital with which to discount to a present value both the projected net cash flows and the estimated terminal or residual value.[54]

Ruback's valuation used the Hempstead Valuation's discounted cash flow with four modifications.[55] Because both parties agree with the basic model and because I have reviewed it and found it fundamentally sound, I will focus on each of these modifications separately.

a. Adjust Fee for Collected Revenue

Ruback first added in a fee equal to forty percent of all collected revenue for all services provided at each facility, based on a provision in the Consent Decree that allegedly would have all profits swept into the joint venture so that Colkitt's company, Oncology Associates, P.C. ("OA"), would never earn a profit. This forty percent fee represents that would-be profit. Counterclaim Defendants disagree wholeheartedly with that interpretation of the Consent Decree.

■ Neither side disputes that the Consent Decree called for OA to pay a fee to OTI equal to twenty percent of the amount OA paid for professional services, or that the amount paid was to be reviewed on an annual basis and, if necessary, "adjusted by the mutual consent of MDI, OSI, and OA."[56] Significantly, however, Counterclaim Defendants argue that the provision does not call for the adjustment to be automatic for the simple reason that the Consent Decree did not prohibit OA from earning a profit. Furthermore, argue Counterclaim Defendants, any such interpretation by this Court would be a violation of the parol evidence rule, as "the contract is clear."

I do not believe it is so clear, however, as I must view the Consent Decree not as a document created in a vacuum but as one created as a response to the significantly changed relationship between the parties. And as DiGiacobbe testified, the previous agreement between the parties was that all profits would flow to OTI.[57] DiGiacobbe's testimony was credible and convincing, and the numbers he provided made it sensible that this is what the parties planned.[58] Because doctors' salaries

C.A. Nos. 7959, 7960, 7967, & 7968, 1988 WL 15816, Jacobs, V.C. (Feb. 22, 1988), aff'd, Del.Supr., 564 A.2d 1137 (1989); Associated Imports, Inc. v. ASG Industries, Inc., Del.Ch., C.A. No. 5953, 1984 WL 19833, Duffy, J. (ret.) (June 20, 1984), aff'd sub nom. Hubbard v. Associated Imports, Inc., Del.Supr., 497 A.2d 787 (1985).

54. Cede at 17–18.

55. I do not understand why Ruback's appraisal report did not include a valuation amount for the derivative claim allegations, as this amount is sought in their unfair dealing claim. As Counterclaimants state it, the derivative claims are for "grossly exorbitant management fees, diversions of revenue to OA through improper allocations, and the development of numerous additional centers with OTI's profits." Counterclaimants' Post–Tr. Br. at 75. Since derivative claim damages are presumably for past harms, not future harms, damages awarded should be counted as a lump sum in the year they are received, something Ruback did not include. In any case, because I find the expected net value of any derivative claims to be zero, see pp. 931–32 infra, the omission of this amount by Ruback is a moot issue.

56. Consent Decree at 21.

57. Tr. 1822–25 (DiGiacobbe).

58. Specifically, DiGiacobbe stated that the 20% fee agreement was reached because the actual salaries and expenses needed to retain competent doctors for OTI would not likely exceed 32% of total revenue. The billing system in place allocated 40% of billing to professional services, and 20% of that 40% (which flowed to OA), or 8%, was to be paid back to OTI. This 8% plus the 32% cost of doctors totaled the 40% received under the billing system by OA, and so when the 8% was sent back to OTI, OA showed no profits.

would fluctuate from year to year, this twenty percent was to be recalculated as needed. Naturally the amount would need to be agreed to by all parties, since it was a joint venture they were running. In short, I do not believe the parol evidence rule prohibits the Court from considering the ongoing relationship between the parties in interpreting a contractual term.

Regarding Counterclaim. Defendants' point that there were no specific discussions between DiGiacobbe and Colkitt on the matter, that only supports the interpretation that it was business as usual between the parties in this area after the Consent Decree was put into place. I do not believe that this Court needs to rely on DiGiacobbe's "secret, unexpressed intentions" to reach this conclusion.[59]

Colkitt denies that he and DiGiacobbe understood that OA would not earn a profit, while DiGiacobbe states that that was their understanding. Here I must choose which witness was more believable, and having had the opportunity to observe both witnesses testify, I am more apt to believe DiGiacobbe than Colkitt. As a result, I find that the intention of the parties was for OA not to earn a profit, and because Counterclaimants have provided a valid reason for why the fee should be increased from twenty percent to forty percent—specifically, because that is the amount that will offset any would-be profits for OA—I allow in full the adjustment made to the Hempstead Valuation's figures by Ruback.

### b. Reduce Management Fee

Ruback's second adjustment to the Hempstead Valuation's discounted cash flow model was to "change the 20% management fee paid to a Colkitt affiliate to the industry standard of 10%." Counterclaim Defendants object to this adjustment, arguing that the breadth of services provided by the contract far exceeded any "industry standard" and so the fee was

reasonable. Furthermore, they continue, the fee was actually 18%, not 20% as alleged, because when the fee paid by OTI to Oncology Services Corporation ("OSC"), a Colkitt-owned company that succeeded OSI in providing management services to OTI, was increased from 15% to 20%, it was only done so for the technical revenues, which made up 60% of revenues. For the remaining 40% professional component of revenues, the fee remained at 15%.

To support their position, Counterclaim Defendants offered Kirk Rebane ("Rebane"), an appraiser of physician practices and ancillary healthcare service companies, as an expert witness. Rebane testified convincingly that the fee charged was a reasonable one. He surveyed twenty-two companies that provide billing services for healthcare facilities and determined that 7.5% was a reasonable rate for this part of the fee. He then determined the value of the non-billing services by adding up the cost to do them and dividing it by the revenues of the Eight Centers to arrive at a 14% fee. The sum of these two figures, 21.5%, is greater than the 18% charged by OSC. Counterclaim Defendants and Rebane performed a number of other "reasonableness" tests, including looking at fees charged by PPM companies and receiving quotes from independent third parties for the same billing. All indications from these sources were that the 18% fee charged was reasonable.

Counterclaimants primarily countered this evidence by arguing that Rebane was not qualified to testify on billing rates in the field of radiation oncology management because of his "complete lack of education, training or expertise in the field of radiation oncology center management."[60] This argument is not convincing—merely because Rebane does not have specific knowledge of this very specialized area does not mean that he cannot properly

**59.** Countercl. Defs.' Post–Tr. Br. at 59.

**60.** Counterclaimants' Post–Tr. Br. at 113.

calculate a reasonable management fee for such a company, especially considering his extensive work in consulting in the medical field.

Counterclaimants also argue that it cost OSC far less than 20% to provide the services to OTI. I do not consider it important what it might have *cost* OSC; my concern is that OSC did not charge a non-market rate for these services and thus create an artificially low income level for OTI for purposes of the appraisal. As a result of the foregoing analysis, I believe the management fee applied in the Hempstead Valuation was appropriate.

### c. Reduce Discount Rate

Ruback's third modification is to the discount rate the Hempstead Valuation applies to the future cash flows, arguing that 22.5% is far too high. He proposes a rate of 13.9%, eliminating the "small stock" and "company specific risk" premiums included in Hempstead's rate. Counterclaim Defendants object to this, insisting Hempstead's discount rate is the appropriate one.

The Hempstead Valuation uses the following method to calculate its discount rate of 22.5%:

| | |
|---|---|
| 90 day Treasury Bill [61] | 5.5% |
| S & P 500 risk premium | 8.4% |
| "Small" stock premium | 5.2% |
| Required ROR—Eight Centers [62] | 3.4% |
| | |
| Total | 22.5% |

Specifically, Ruback objects to the small stock premium and the company specific risk premium (*i.e.*, the specific required rate of return for these cancer centers) and removes both of them from his calculation to arrive at a discount rate of 13.9%. I believe the correct rate lies somewhere in between these two figures. Ruback is wrong to exclude any sort of additional risk for the Eight Centers above that of the S & P 500 as a whole, but Hempstead is also wrong to include additional risk premiums as large as he does. What follows is my effort to determine how large those premiums should be.

### (i) Company Specific Risk Premium

I begin with an analysis of the validity of the company specific risk premium that Hempstead added, in the amount of 3.4%. Counterclaim Defendants cite two recent cases from this Court for support of the use of a company specific risk premium, *Ryan v. Tad's Enterprises, Inc.*[63] and *Hintmann v. Fred Weber, Inc.*[64] In *Tad's*, however, Vice Chancellor Jacobs did not apply a company specific risk premium; instead, he used the beta calculated by the plaintiff's expert. The Vice Chancellor did find that this beta was derived by comparing the riskiness of the subject company's stock with that of a less risky comparable company. That is not the case here, however, as the Hempstead Valuation did not calculate a beta for the Eight Centers because, as Counterclaim Defendants point out in their brief, "[f]or *public* companies, ... beta ... is a mathematical measure of a particular company's volatility compared to a broader market."[65]

Counterclaim Defendants' argument that *Hintmann* is applicable is a bit more on the mark. In *Hintmann*, Vice Chancellor Steele found that the plaintiff "failed to carry its burden of proving the appropriateness of adding a 3% company specific risk premium," as "[n]either of [the appraiser's] proposed reasons for adding the extra premium translated into greater

---

**61.** Alternatively, Hempstead applies a 6.9% 30–Year Treasury Bond yield and a 7.0% S & P 500 risk premium over that yield, resulting in the same 13.9% total for the risk-free rate plus the S & P 500 premium.

**62.** The required rate of return also is referred to as the company specific premium.

**63.** Del.Ch., 709 A.2d 682 (1996), *aff'd*, Del. Supr., 693 A.2d 1082 (1997).

**64.** Del.Ch., C.A. No. 12839, 1998 WL 83052, Steele, V.C. (Feb. 17, 1998).

**65.** Countercl. Defs.' Post–Tr. Br. at 69 (emphasis added).

risk." [66] There the appraiser stated in his report that the premium was added to reflect "the risk we believe was inherent in management's projections," while at trial he said it was added because the subject company was "much more geographically constrained than was the case in the public companies that we looked at." [67]

■ ■ Presumably, Counterclaim Defendants cite to *Hintmann* for the proposition that a small stock premium is appropriate and not for the fact that defendants there failed to carry their burden of showing that the premium was appropriate. But the law requires that the party seeking to add the premium (here, the Counterclaim Defendants) bears the burden of showing that the premium is appropriate.[68] I find they have only partly met that burden.

The concept of a company specific risk premium is not so prevalent as Counterclaim Defendants imply, however. In fact, its appearance in our case law is limited to *Hintmann,* although in *Gilbert v. M.P.M. Enterprises, Inc.,*[69] Vice Chancellor Steele applied both a beta and a small company premium, with the beta perhaps acting as a surrogate company specific risk premium. Because I agree that the Court should not be a slave to the past when that past "does not reflect the present state of widely accepted valuation theory," [70] I am willing to accept that the addition of a company-specific premium is appropriate in the absence of beta.

The next step is to determine what that premium is. Hempstead cited several reasons for his choice of a company-specific

premium, without assigning a percentage to any of them with specificity, including:

- Complete dependence on an affiliated physician group for patient referral
- Strong and growing competition in the market
- Ongoing trends towards managed care and its attendant pressure on reimbursement rates
- Increasing health care regulations
- Dependence on a single location
- Risk of obsolescence from changes in technology or treatment practice

I do not believe all of these items are particularly specific to the Eight Centers, especially the ones relating to competition, dependence on a single location, and risk of obsolescence. Such "company specific" risks apply to nearly all companies in the entire United States economy, and as such they are already factored into the S & P 500 premium. It is hard to say the trends toward managed care and increased health care regulations are *company* specific, but since they do not affect the S & P 500 generally, I will allow them. Because, as I have mentioned, the Hempstead Valuation does not state how much impact on the company specific premium each of these factors has, I will estimate that they are approximately equal; therefore, because I have eliminated half of them, I reduce the company specific risk premium by an equal amount, to 1.7%.

### (ii) Small Stock Premium

This Court has traditionally recognized the existence of a small stock premium in appraisal matters.[71] The Hempstead Val-

---

**66.** *Hintmann* at 16, 15.

**67.** *Id.* at 15.

**68.** *Id.*

**69.** Del.Ch., C.A. No. 14416, 1998 WL 229439, Steele, V.C. (Apr. 24, 1998), Letter Op. at 5–11.

**70.** Counterclaimants' Post–Tr. Br. at 112 (citing *Universal City Studios, Inc. v. Francis I. duPont & Co.,* Del.Supr., 334 A.2d 216, 219 (1975)).

**71.** *See, e.g., Gilbert* at 8; *Hintmann* at 12; *Le Beau v. M.G. Bancorporation, Inc.,* Del.Ch., C.A. No. 13414, 1998 WL 44993, Jacobs, V.C. (Jan. 29, 1998), Mem. Op. at 9–10, 26–27; *In re Radiology Assocs., Inc. Litig.,* Del.Ch., 611 A.2d 485, 490 (1991); *Neal v. Alabama By–Products Corp.,* Del.Ch., C.A. No. 8282, 1990 WL 109243, Chandler, V.C. (Aug. 1, 1990), Mem. Op. at 16, 20, 21–22, *aff'd,* Del.Supr., 588 A.2d 255 (1991).

While not all academics have embraced the idea of a small stock premium wholeheartedly, *see, e.g.,* Richard A. Brealey &

uation relied on by Counterclaim Defendants cites a study by Ibbotson Associates showing that over the past seventy years, "stocks in the smallest quintile of the New York Stock Exchange listed companies have achieved a return of 5.2% above the returns that would be expected based upon the capital asset pricing model." [72] Counterclaimants' expert Ruback disagrees with this entirely, stating the small stock premium is "inappropriate under the principles of Financial Economics and the Capital Assets Pricing Model." [73] Because, as I have just stated, this Court has already accepted the concept of a small stock premium, I find Ruback's view to be incorrect as a matter of law, and I must determine what that premium is in this case. As with the company-specific premium, the burden is on Counterclaim Defendants to prove the amount.

The Hempstead Valuation relies on the Ibbotson survey to determine the appropriate small stock premium. Specifically, Hempstead uses Ibbotson's Table 6–6 to determine that the 17.4% average annual return for companies in the bottom quintile, arranged by market capitalization amount, of the New York Stock Exchange

(the "Small Company Return") less the 12.2% average annual return for companies in the NYSE's top quintile (the "Large Company Return") equals the 5.2% small stock premium that should be added into the discount rate. My reading of the Ibbotson Report, however, suggests there are many possible interpretations of what is an appropriate small stock premium. I focus more on Table 7–4, in which Ibbotson compares the performance of various groups of stocks on the New York Stock Exchange with each other and with the NYSE as a whole.[74] For example:

- In the sixty-nine year span from year-end 1925 through year-end 1994, the NYSE, as a whole, averaged a 9.89% annual return, while the smallest quintile of stocks, the so-called "micro-cap" stocks,[75] averaged a 12.50% annual return.[76] This difference is 2.61%.

- Looking at the forty-nine year return up through 1994—a period that may very well meet Brealey and Myers' statement, "Our only hope of gaining insights from historical rates of return

Stewart C. Myers, *Principles of Corporate Finance* 188 (5th ed. 1996) ("What about the anomalous relationship between stock returns and firm size or the market-to-book ratio? . . . Maybe [they] are simply chance results, the effect of data snooping."), others do agree that it is an actual and relevant effect, *see, e.g.,* Shannon Pratt et al., *Valuing a Business* 171 (3d ed. 1996) ("A substantial body of published research indicates that the size of the company is important in that stocks of smaller companies are riskier than larger ones and that small-company stocks command a higher expected rate of return in the market."); Stephen A. Ross et al., *Fundamentals of Corporate Finance* 350, 406 (5th ed.1996) (differentiating between the returns for large and small stocks). It is important to note, however, that even those who do not accept the small stock premium in full, *e.g.,* Brealey and Myers, do acknowledge it may exist in some form.

72. Countercl. Defs.' Post–Tr. Br. at 68, citing Ibbotson Associates, *Stocks, Bonds, Bills and Inflation, 1995 Yearbook* 123–28 (1995) (the "Ibbotson Report").

73. Ruback at ¶ 25.

74. I recognize that the NYSE as a whole is not the same as the S & P 500. In fact, the NYSE is likely to have a higher return than the S & P 500 if it is true that small stocks outperform large ones, since the entire NYSE includes a broad range of company sizes. My point, however, is to show how the period compared affects the relative performance of the groups of stocks significantly.

75. The portions of Ibbotson that were introduced into the record do not state with certainty that the Small Stock Return's stocks are in the smallest quintile, but I presume they are based on the context. In any case, this should not affect my analysis.

76. The 1925 index value was 1.0, the 1994 micro-cap index was 3380.446, and the 1994 total NYSE index was 671.490. *See* Ibbotson, *supra* note 72, at Table 7–4.

is to look at a very long period." [77]—the average annual return is 12 .25% for micro-cap stocks and 11.31% for the NYSE as a whole, for a mere 0.94% difference.

- Looking at the index change from 1979 to 1994, the average annual return of the micro-cap stocks is 11.94%, actually 2.47% *below* that of the NYSE as a whole, which averaged 14.41%.

The significant differences between these premiums, even when looking at long periods of time, indicate to me that "data snooping," or searching records to find anomalies that might not exist over longer or different periods of time, is very possible in determining a small stock premium, as Ruback testified some finance experts believe.[78] In fact, data snooping is just as possible when picking the appropriate long-term period, as evidenced by the comparison above of the forty-nine and sixty-nine year periods.

Thus, it seems to me that a small stock premium exists, but just as the difference in returns over sixty-nine years is much greater than that over other, perhaps equally valid periods of time, the 5.2% small stock premium that Hempstead reports is also likely too large.[79] I think the better approach is to weight the more recent results more heavily than the older ones.[80] To accomplish that, I will take the returns over the past 14, 28, 42, 56, and 69 years and average them, generating a weighted return over the past 69 years for both the smallest quintile and the entire NYSE universe of stocks. This will have the effect of weighting the most recent period five times as much as the first period, the second most recent period four times as much as the earliest, and so on. I believe this to be a more accurate method of determining the existence and magnitude of any small stock premium, as anecdotal evidence suggests that the wide availability of information on small stocks is gradually attenuating the small stock premium. Any premium demanded by investors today, and over the next ten years, would be more heavily influenced by recent small stock premiums than by historic ones.

| Period | Micro–Cap Return | Entire NYSE Return | Difference |
|--------|------------------|--------------------|------------|
| 1925–94 | 12.50% | 9.89% | 2.61% |
| 1938–94 | 14.48% | 11.33% | 3.15% |
| 1952–94 | 13.11% | 11.30% | 1.81% |
| 1966–94 | 12.54% | 10.76% | 1.78% |
| 1980–94 | 10.76% | 13.23% | (2.47%) |
| Average | 12.68% | 11.30% | 1.38% |

Adjusting at least somewhat for data snooping, therefore, the size effect of small company stocks compared to the NYSE stock universe over the past sixty-nine years is significantly smaller than it appears at first glance (looking *only* at the sixty-nine year average annual return)—not 2.61%, but 1.38%. But this is not the ultimate conclusion, as this "small stock premium" does not compare small stocks to S & P 500 stocks but to the NYSE as a whole. I need to make additional calculations to reach the appropriate number.

77. Countercl. Defs.' Post–Tr. Br. at 69, quoting Brealey & Myers, *supra* note 71.

78. Tr. 2629–32 (Ruback).

79. I also find that the Hempstead Valuation's use of a small stock premium derived by subtracting the return of the largest quintile of NYSE firms from the return on the smallest to be slightly in error, as the appropriate comparison should be the smallest quintile to the S & P 500. The error, however, is not fatal, as the S & P 500 is made up of many of the largest NYSE stocks and so is probably similar to the largest quintile. *See* Standard & Poor's, *The S & P 500 Composite Stock Price Index*, (visited Apr. 16, 1999) <http://www.annuity.com/SP50.html>.

80. Brealey and Myers argue there is "evidence that the size effect has become less important since it was first discovered" and documented in Rolf Banz, *The Relationship Between Return and Market Values of Common Stock*, 9 J. Fin. Econ. 3–18 (1981). Brealey & Myers, *supra* note 71, at 188 n. 20. They believe that the mere discovery—that a company's size may influence the return on its stock in excess of CAPM—should lead to its disappearance in an efficient market. *See id.* at 188.

As described above, Hempstead calculated his 5.2% small stock premium using Table 6–6 of Ibbotson, which was the difference between the sixty-nine year average annual Small Company Return (17.4%) and Large Company Return (12.2%). Table 6–6 is not broken down by year in the same way as Table 7–4, so I cannot directly determine a more appropriate return (*i.e.,* "non-data-snooped") based on that difference. But when I consider the fact that data snooping increased the difference I calculated above by 1.89 times (2.61% divided by 1.38%), I can assume it affected the 5.2% difference cited by Ibbotson and Hempstead to the same extent. Thus, the appropriate small stock premium is not 5.2% but 2.75%.[81]

I conclude that the appropriate discount rate to be applied is 18.35%:

| | |
|---|---|
| 90 Day Treasury Bill | 5.5% |
| S & P 500 Risk Premium | 8.4% [82] |
| Small Stock Premium | 2.75% |
| Company Specific Premium | 1.7% |

Judicially Determined Discount Rate: 18.35%

### d. Adjust Terminal Value

Ruback's final modification to the Hempstead Valuation's discounted cash flow model is to increase the terminal value applied to the company by using an EBIT multiple determined by comparison to AOR and PRN. As I determined above, AOR and PRN are *not* comparable to the Eight Centers, and so I accord this method no weight. The Hempstead Valuation, on the other hand, uses the Constant Growth Valuation Model ("CGVM"), which is widely accepted as the best, even if imperfect, method to determine a terminal value for a discounted cash flow analysis. The CGVM multiple is determined by the formula:

$$\frac{(1+g)}{(r\text{-}g)}$$

where $g$ = estimated long-term earnings growth rate, and $r$ = investor's required rate of return.

Because of its wide acceptance, I adopt this method as the appropriate one, adjusting it, of course, for my recalculated required rate of return (*i.e.,* discount rate) of 18.35%. Thus, the CGVM multiple I will apply is:

$$\frac{1 + .03}{.1835\text{-}.03} = 6.7101x$$

### e. Calculation

Now I will recalculate the value of the company using the discounted cash flow method as it appears in the Hempstead Valuation with the adjustments I have determined to be appropriate. I will combine the Eight Centers' cash flows into one table, as Ruback did in his analysis, for simplicity's sake.

81. My calculations are as follows:

(a) Difference between Total Weighted NYSE Return and Micro–Cap Stock Return over 69 Years (Table 7.4): 2.61%

(b) Difference between Total Weighted NYSE Return and Micro–Cap Stock Return over 69 Years (My Calculation): 1.38%

Overestimation of difference due to data snooping [ (a) / (b) ]: 1.891x

(x) Difference between Average Total Return for Large and Small Company Stocks over 69 Years (Table 6–6): 5.2%

(y) Overestimation of weighted difference due to data snooping: 1.891x

Difference between Average Total Return for Large and Small Company Stocks over 69 Years [ (x) / (y) ]: 2.75%

82. As mentioned above, Hempstead alternatively applies a 6.9% Treasury Bond yield and a 7.0% S & P 500 risk premium over that yield, resulting in the same 13.9% total.

| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 | Year 11 | Terminal Value |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Interest Bearing Debt, Beginning of Period | (4,676,203) | (4,053,407) | (3,633,232) | (2,790,527) | (1,689,142) | (753,016) | (161,069) | (92,471) | (34,758) | 0 | 0 | |
| Treatments | 49,923 | 52,727 | 55,691 | 58,827 | 62,144 | 64,009 | 65,929 | 67,907 | 69,944 | 72,043 | 74,204 | |
| Revenue per Treatment | 254 | 255 | 258 | 260 | 262 | 263 | 264 | 265 | 256 | 257 | 258 | |
| Technical Revenue | 12,669,654 | 13,467,930 | 14,362,895 | 15,296,617 | 16,299,591 | 16,850,345 | 17,420,111 | 18,009,559 | 18,619,385 | 19,250,308 | 19,903,074 | |
| Professional Revenue | 8,446,369 | 8,991,953 | 9,576,283 | 10,199,078 | 10,868,394 | 11,233,563 | 11,813,407 | 12,006,373 | 12,412,923 | 12,833,539 | 13,268,716 | |
| Total Revenue | 21,115,923 | 22,479,883 | 23,938,158 | 25,497,695 | 27,165,985 | 28,083,908 | 29,033,518 | 30,015,932 | 31,032,308 | 32,083,847 | 33,171,790 | |
| Operating Expenses - Regular | 6,089,325 | 6,353,842 | 6,631,954 | 6,924,485 | 7,232,317 | 7,232,317 | 7,232,317 | 7,232,317 | 7,232,317 | 7,232,317 | 7,232,317 | |
| Operating Expenses - Management Fee | 3,800,866 | 4,046,379 | 4,308,869 | 4,589,585 | 4,889,877 | 5,055,104 | 5,226,033 | 5,402,888 | 5,585,816 | 5,775,092 | 5,970,922 | |
| Operating Expenses - Professional | 5,490,140 | 5,844,770 | 6,225,921 | 6,629,401 | 7,063,156 | 7,063,156 | 7,063,156 | 7,063,156 | 7,063,156 | 7,063,156 | 7,063,156 | |
| Total Operating Expenses | 15,380,331 | 16,244,991 | 17,164,744 | 18,143,471 | 19,185,350 | 19,350,577 | 19,521,506 | 19,698,341 | 19,881,289 | 20,070,565 | 20,268,395 | |
| Operating Income | 5,735,592 | 6,234,892 | 6,773,415 | 7,354,224 | 7,980,635 | 8,733,332 | 9,512,012 | 10,317,591 | 11,161,020 | 12,013,281 | 12,905,395 | |
| Interest Expense - Lease | 306,826 | 243,978 | 204,635 | 160,040 | 117,584 | 117,584 | 117,584 | 117,584 | 117,584 | 117,584 | 117,584 | |
| Interest Expense - Mortgage | 345,155 | 336,598 | 288,885 | 166,888 | 75,486 | 75,486 | 75,486 | 75,486 | 75,486 | 75,486 | 75,486 | |
| Total Interest Expense | 651,981 | 580,576 | 493,500 | 332,928 | 193,070 | 193,070 | 193,070 | 193,070 | 193,070 | 193,070 | 193,070 | |
| Pre-Tax Income | 5,083,611 | 5,654,316 | 6,279,915 | 7,021,296 | 7,787,565 | 8,540,282 | 9,318,942 | 10,124,521 | 10,967,950 | 11,820,211 | 12,712,325 | |
| Tax Rate | 39% | 39% | 39% | 39% | 39% | 39% | 39% | 39% | 39% | 39% | 39% | |
| Income Tax | 1,982,608 | 2,205,183 | 2,449,197 | 2,738,305 | 3,037,150 | 3,330,702 | 3,634,397 | 3,948,563 | 4,273,500 | 4,609,882 | 4,957,807 | |
| Net Income | 3,101,003 | 3,449,133 | 3,830,748 | 4,282,990 | 4,750,414 | 5,209,580 | 5,684,555 | 6,175,958 | 6,684,349 | 7,210,329 | 7,754,518 | |
| Working Capital | 193,588 | 204,594 | 218,741 | 233,931 | 250,243 | 250,243 | 250,243 | 250,243 | 250,243 | 250,243 | 250,243 | |
| Free Cash Flow | 2,907,415 | 3,244,539 | 3,612,007 | 4,049,059 | 4,500,171 | 4,959,317 | 5,434,312 | 5,925,716 | 6,434,106 | 6,960,086 | 7,504,275 | |
| Repayment of Principal - Lease | 547,148 | 342,035 | 234,338 | 272,932 | 836,287 | 836,287 | 836,287 | 836,287 | 836,287 | 836,287 | 838,287 | |
| Repayment of Principal - Mortgage | 75,550 | 78,082 | 599,427 | 837,453 | 99,858 | 99,858 | 99,858 | 99,858 | 99,858 | 99,858 | 99,858 | |
| Total Repayment of Principal | 622,798 | 420,117 | 833,765 | 1,110,385 | 936,125 | 936,125 | 936,125 | 936,125 | 936,125 | 936,125 | 936,125 | |
| Net Cash Flow | 2,284,617 | 2,824,422 | 2,778,242 | 2,938,674 | 3,564,046 | 4,023,192 | 4,498,187 | 4,989,590 | 5,497,981 | 8,023,961 | 6,568,150 | 44,072,544 |
| Discount Interval (years) | 0.5 | 1.5 | 2.5 | 3.5 | 4.5 | 5.5 | 6.5 | 7.5 | 8.5 | 9.5 | 10.5 | 10.5 |
| Present Value Factor @ 18.35% | 0.91921 | 0.77669 | 0.65927 | 0.55451 | 0.46854 | 0.39589 | 0.33451 | 0.28284 | 0.23882 | 0.20179 | 0.17050 | 0.17050 |
| PV of Current Year Cash Flow | 2,100,043 | 2,193,700 | 1,823,277 | 1,629,524 | 1,669,898 | 1,592,741 | 1,504,588 | 1,410,258 | 1,313,028 | 1,215,575 | 1,119,870 | 7,514,437 |
| Present Value of Net Cash Flow | 25,087,040 | | | | | | | | | | | |
| Fair Value of HDI's 40% Share | 10,034,816 | | | | | | | | | | | |

Description of DCF lines (and source of information)

- "Hempstead" is Hempstead & Co., Inc.'s August 29, 1997 valuation, Table Y ("Cancer Centers Combined DCF").

- "Ruback" is Report of Richard S. Ruback, dated July 25, 1997, Exhibit 7b.

| Line | Description |
|------|-------------|
| 1 | Sum of Eight Centers' Fair Value Reports (Hempstead and Ruback) |
| 2 | Sum of Eight Centers' Fair Value Reports (Hempstead and Ruback) |
| 3 | [4] / [2] |
| 4 | Sum of Eight Centers' Fair Value Reports (Hempstead and Ruback) |
| 5 | ( [4] / 60%) × 40% (Judicially-determined professional revenue) |
| 6 | [4] + [5] |
| 7 | Sum of Eight Centers' Fair Value Reports (Hempstead and Ruback) |
| 8 | [6] × 15% (Judicially-determined management fee) |
| 9 | [6] × 26% (Professional expenses in the amount of 26% of Total Revenue in each year, which is the average for COG for three years ended December 31, 1992, 1993, and 1994) (Ruback) |
| 10 | [7] + [8] + [9] |
| 11 | [6]—[10] |
| 12 | Sum of Eight Centers' Fair Value Reports (Hempstead and Ruback) |
| 13 | Sum of Eight Centers' Fair Value Reports (Hempstead and Ruback) |
| 14 | [12] + [13] |
| 15 | [11]—[14] |
| 16 | Sum of Income Tax / Sum of Pretax Income from Eight Centers' Fair Value Reports (Hempstead and Ruback) |
| 17 | [15] x[16] |
| 18 | [15]—[17] |
| 19 | Sum of Eight Centers' Fair Value Reports (Hempstead and Ruback) |
| 20 | [18]—[19] |
| 21 | Sum of Eight Centers' Fair Value Reports (Hempstead and Ruback) |
| 22 | Sum of Eight Centers' Fair Value Reports (Hempstead and Ruback) |
| 23 | [21] + [22] |
| 24 | [20]—[23] (Judicially-determined terminal value) |
| 25 | Years out less .5 year (Hempstead and Ruback) |
| 26 | 1 / (1 + 18.35%)[25] (Judicially-determined 18.35% discount rate) |
| 27 | [24] x[26] |
| 28 | Sum of [27] across |
| 29 | [28] × 40% (Counterclaimants' share of the Eight Centers) |

## C. Final Determination of Fair Value

My two calculations for the value of the Eight Centers (without yet valuing the winding-down operations of OTI, the value of which is undisputed) are $25,800,000 using the stock market value approach and $10,034,816 using the discounted cash flow method. As I stated above, this Court favors the discounted cash flow approach, based in large part on its wide acceptance. Furthermore, I believe it is a more accurate predictor of the value of the company, as it only considers factors affecting the Eight Centers, whereas the stock market approach may include to an unknown degree factors beyond just the Eight Centers and extending to EquiMed. As a result, I will weight the discounted cash flow method at twice the stock market method [83] and assign a value of $15,289,877 to the Eight Centers.[84] The final step is to add in the

83. In the past, this Court has reduced the weight of market price valuations in appraisal cases where no reliable market existed for the stock. *See, e.g., Tannetics, Inc. v. A.J. Indus., Inc.,* Del.Ch., C.A. No. 5306, 1979 WL 2700, Marvel, C. (July 17, 1979) (15 percent weight given to market price); *Francis I. Dupont & Co. v. Universal City Studios, Inc.,* Del.Ch., 312 A.2d 344 (1973), *aff'd,* Del.Supr., 334 A.2d 216 (1975) (12.5 percent weight); *Swanton v. State Guar. Corp.,* Del.Ch., 215 A.2d 242 (1965) (10 percent weight).

Here, I do not believe there is *no* reliable market for the stock, but I also believe the discounted cash flow method is a more accurate predictor of the value of the Counter-claimants' share. The stock market valuation, being significantly higher than the DCF valuation, may take into account economies of scale, synergies, or other factors not contained in the DCF valuation. As such, I will discount its weight by the amount I deem appropriate, here to one-half the weight of the DCF valuation. *Cf. Kleinwort Benson, Ltd. v. Silgan Corp.,* Del.Ch., C.A. No. 11107, 1995 WL 376911, Chandler, V.C. (June 15, 1995) (weighting the Court's comparative market analysis valuation at one-half the discounted cash flow valuation).

84. Calculated as: ((2 × $10,034,816) + $25,800,000) / 3 = $15,289,877.

value of OTI. Hempstead reports its value as of the valuation date to be $2,263,-452, and Counterclaimants do not object. Counterclaimants' share of the company is 40%, or $905,381, so adding that to the $15,289,877 fair value of the Eight Centers gives a total fair value of $16,195,258 as of the date of the Cash–Out Mergers.

## D. Interest

■ The parties agree that the prudent investor rate of interest that shall apply is 0.86% per month.[85] The parties disagree, however, on whether interest should be simple or compound. This Court has considered this issue before.[86] In this case, I am convinced that the fair rate of interest

should be compound. It is simply not credible in today's financial markets that a person sophisticated enough to perfect his or her appraisal rights would be unsophisticated enough to make an investment at simple interest [87]—in fact, even passbook savings accounts now compound their interest daily. This fundamental economic reality strongly indicates to me that, our litigants typically being at least as financially sophisticated as passbook savings holders and seeking at least the same return, interest on appraisal cases should be compounded *daily*, not monthly. As for the defendant company in an appraisal action, it is even harder to imagine a corporation today that would seek simple interest on the funds it holds.[88] One cannot

85. This agreement is unusual in an appraisal case. In Delaware's growing body of appraisal case law, many pints of toner fluid (and typewriter ribbon ink before that) have been spilled as a result of attorneys arguing over the appropriate interest rate to be applied and judges analyzing the arguments and determining that rate. A commentator's recent suggestion has strong intuitive appeal:

Because the dissenting shareholder is entitled to payment as of the transaction date, and often does not receive full payment until much later, appraisal litigation often involves a skirmish over the amount of interest the corporation must pay the shareholder as a result of this delayed payment. In many cases, the litigants and courts have expended considerable energy resolving the interest rate that should be applied in this context. A statutorily defined rate of interest would simplify matters and eliminate this counterproductive expenditure of resources. The rate chosen must be fair, and able to respond to market conditions, rather than fixed at a level that becomes outdated. An interest rate tied to the prime rate would be a workable solution.

Barry M. Wertheimer, *The Shareholders' Appraisal Remedy and How Courts Determine Fair Value*, 47 Duke L.J. 613, 709–10 (1998).

86. *See, e.g., Gonsalves v. Straight Arrow Publishers, Inc.*, Del.Ch., C.A. No. 8474, 1998 WL 155556, Chandler, C. (Mar. 26, 1998) (compound interest), *aff'd in part and rev'd in part*, Del.Supr., 725 A.2d 442 (1999); *Hintmann v. Fred Weber, Inc.*, Del.Ch., C.A. No. 12839, 1998 WL 83052, Steele, V.C. (Feb. 17, 1998) (compound interest); *Le Beau v. M.G. Bancorporation, Inc.*, Del.Ch., C.A. No. 13414, 1998 WL 44993, Jacobs, V.C. (Jan. 29, 1998) (compound interest), *aff'd in part and rev'd in part*

*en banc*, Del.Supr., 737 A.2d 513 (1999); *Grimes v. Vitalink Communications Corp.*, Del.Ch., C.A. No. 12334, 1997 WL 538676, Chandler, C. (Aug. 28, 1997) (compound interest), *aff'd*, Del.Supr., 708 A.2d 630, *and cert. denied*, 525 U.S. 867, 119 S.Ct. 160, 142 L.Ed.2d 131 (1998); *Ryan v. Tad's Enters., Inc.*, Del.Ch., 709 A.2d 682 (1996) (simple interest), *aff'd*, Del.Supr., 693 A.2d 1082 (1997); *TV58 Ltd. Partnership v. Weigel Broad. Co.*, Del.Ch., C.A. No. 10798, 1993 WL 285850, Chandler, V.C. (July 22, 1993) (simple interest); *Harris v. Rapid–American Corp.*, Del.Ch., C.A. No. 6462, 1990 WL 146488, Chandler, V.C. (Oct. 2, 1990) (simple interest), *aff'd in part and rev'd in part on other grounds*, Del.Supr., 603 A.2d 796 (1992).

87. Commentators hold the same view. *See* Wertheimer, *supra* note 85, at 710 n. 517 ("The award of simple interest penalizes dissenting shareholders and does not accord with economic realities."); David S. Reid, Note, *Dissenters' Rights: An Analysis Exposing the Judicial Myth of Awarding Only Simple Interest*, 36 Ariz. L.Rev. 515, 538 (1994) ("[C]ompound interest is not simply helpful to dissenting shareholders, but rather it is mandatory to achieve full compensation for the loss of use of money. Fortunately, the Delaware appraisal statute was drafted with the foresight to provide the courts with discretion to award compound interest."). Judicial opinions (from non-Delaware jurisdictions at any rate) hold likewise. *See* cases collected in *Grimes*, Mem. Op. at 39 n.92.

88. In another recent case I found:

[C]ompound interest is 'the standard form of interest in the financial market.' ...

imagine that a sophisticated businessman like Colkitt would invest his companies' funds in instruments yielding simple rates of interest. Nor is it conceivable that Colkitt's lenders were providing his companies with capital at simple rates of interest.

Section 262(h) of our General Corporation Law requires the Court of Chancery to determine "a *fair* rate of interest, if any, to be paid upon the amount determined to be the fair value." [89] Section 262(i) elaborates on that point, providing: "Interest may be simple or compound, *as the Court [of Chancery] may direct*." [90] The Delaware Supreme Court recently held, in *M.G. Bancorporation, Inc. v. LeBeau*, that § 262(i) requires this Court to "elaborat[e] upon its decision to award compound interest, on the basis of the record established in [the] case." [91] I note here that the record in this case contains *nothing* to

explicitly guide me as to whether the "fair rate" for these dissenting stockholders involves a simple rate or a compound rate of interest. [92] But I can reasonably infer from the fact that the Counterclaimants were sophisticated enough to bring this suit, that they would at least invest their money in a passbook savings account and therefore earn compound interest. Therefore, I award interest at the rate of .86% per month, compounded monthly. [93]

Before the amendment of section 262(i) in 1987 (which gave this Court discretion to award simple or compound interest), this Court *only* had authority to award simple interest. [94] In the years that followed the 1987 amendment, this Court *routinely* awarded simple interest with no discussion of the matter and *with no reversals or remands from the Supreme Court*. [95] It is only recently that the Court

Certainly respondent has earned compound interest on its investments during the pendency of this proceeding and certainly petitioners would have had to pay compound interest to borrow funds during the pendency of the proceeding. Accordingly, I am unable to conclude that an award of simple interest will adequately compensate the petitioners for the loss of the use of their funds or prevent the corporation from retaining unjust benefits from the use of petitioners' funds.
*Grimes*, Mem. Op. at 38.

89. 8 *Del. C.* § 262(h) (emphasis added).

90. 8 *Del. C.* § 262(i) (emphasis added).

91. Del.Supr., 737 A.2d 513, 527 (1999).

92. Counterclaim defendants contend that the Court must award simple interest for two reasons. First, they argue that simple interest is presumptively the fair rate of interest under our case law. Second, they claim that the dissenting stockholders are estopped from seeking compound interest because their counsel answered a contention interrogatory with a claim for simple interest.
I reject these arguments. Section 262(i) directs this Court to establish a fair interest rate. The parties to this case did not stipulate to the form of interest. Counterclaimants' pre-trial brief requested an "appropriate" rate of interest. Their post-trial brief requested compound, while defendants sought simple. Neither party introduced *any* evidence during

the trial on the simple versus compound issue. Hence, the *record* is silent on this point. Accordingly, this Court exercises its discretion based on the existing record, which includes facts, and inferences, regarding the parties' financial sophistication and the market conditions in which the parties were operating at the time of the Cash–Out Mergers.

93. In fact, as I mentioned above, deposit accounts at banks typically compound interest on a daily basis. Therefore, I think an argument can be made (but was not here) that interest should be compounded on a daily, rather than monthly, basis. The agreed-upon rate in this case, compounded daily, leads to an effective rate of 10.87% per year, barely higher than the 10.82% per year that results from monthly compounding (compared to a 10.32% annual rate of simple interest).

94. *See Grimes*, Mem. Op. at 35–36.

95. *See, e.g., Gonsalves v. Straight Arrow Publishers, Inc.*, Del.Ch., C.A. No. 8474, 1998 WL 155556, Allen, C. (Nov. 27, 1996; revised, Dec. 5, 1996) (no discussion), *rev'd on other grounds*, Del.Supr., 701 A.2d 357 (1997) (no discussion); *Kleinwort Benson, Ltd. v. Silgan Corp.*, Del.Ch., C.A. No. 11107, 1995 WL 376911, Chandler, V.C. (June 15, 1995) (no discussion); *Wacht v. Continental Hosts, Ltd.*, Del.Ch., C.A. No. 7954, 1994 WL 728836, Chandler, V.C. (Dec. 23, 1994) (no discussion); *Chang's Holdings, S.A. v. Universal*

of Chancery has awarded compound interest. But in *Gonsalves v. Straight Arrow Publishers, Inc.*, the Supreme Court reversed and remanded this Court's decision to award compound interest, stating that the "new pattern, one of awarding compound interest *as a matter of course,* ... is of concern ... [s]ince the Court of Chancery provided no explanation for its selection of compound interest." [96] And, in *Le Beau*, the Supreme Court again expressed concern about the "developing *trend* toward the routine awarding of compound interest," stating "[s]uch an award, however, is the exception rather than the *rule.*" [97]

But where did the *rule* of simple interest come from? Since 1987 (to repeat) the Legislature has made it clear that *either* simple *or* compound interest may be awarded, as the Court of Chancery directs. The *rule* of simple interest, therefore, was legislatively abolished in 1987. Now, it is quite true that the Court of Chancery has,

in many appraisal decisions since 1987, routinely awarded simple interest, often without explanation. [98] On other occasions, interestingly, the Court has referred to the "practice" or "tradition" of simple interest as its rationale for awarding simple, rather than compound, interest. Of equal note, the Supreme Court either has affirmed these unexplained simple interest determinations, entirely without comment, or has expressly deferred to the Court of Chancery's "broad power under 8 *Del. C.* § 262(i)," acknowledging the trial judge's discretionary authority to determine a fair rate (and form) of interest. [99]

So what is a trial judge in an appraisal case today to make of the Supreme Court's concern that recent Chancery decisions awarding compound interest appear to be a "developing trend" or a "new pattern." If it is fair to call decisions in four appraisal cases [100] a trend, it nonetheless seems no less justified than the pre-existing trend or practice (over more than a dozen cases) [101]

*Chems. & Coatings*, Del.Ch., C.A. No. 10856, 1994 WL 681091, Chandler, V.C. (Nov. 22, 1994), (one paragraph holding that petitioners had not persuaded the Court that it should diverge from "general practice" of awarding simple interest); *Salomon Bros. Inc. v. Interstate Bakeries Corp.*, Del.Ch., C.A. No. 10054, 1992 WL 94367, Berger, V.C. (May 4, 1992) (no discussion); *Hodas v. Spectrum Tech., Inc.*, Del.Ch., C.A. No. 11265, 1992 WL 364682, Berger, V.C. (Dec. 8, 1992) (no discussion); *Cooper v. Pabst Brewing Co.*, Del. Ch., C.A. No. 7244, 1993 WL 208763, Hartnett, V.C. (June 8, 1993) (no discussion); *In re Appraisal of Shell Oil Co.*, Del.Ch., Consol. C.A. No. 8080, 1990 WL 201390, Hartnett, V.C. (Dec. 11, 1990) (no discussion), *aff'd*, Del.Supr., 607 A.2d 1213, 1222 (1992) (holding "we are not inclined to disturb the discretion exercised here in the awarding of simple interest"); *Harris v. Rapid–American Corp.*, Del.Ch., C.A. No. 6462, 1992 WL 69614, Chandler, V.C. (Oct. 2, 1990) (noting that "[t]he parties did not stipulate and do not agree, however, as to whether such interest should be simple or compound," that decision was "thereby left to the discretion of the Court" which chose "not to depart from [its] 'standard practice' of allowing only simple interest"), *aff'd in part and rev'd in part on other grounds*, Del.Supr., 603 A.2d 796, 809 (1992) ("In view of the trial court's broad powers under § [sic] 8 Del. C. [§ ] 262(i),

there clearly was no error or abuse of discretion in awarding Harris simple interest."); *Neal v. Alabama By–Products Corp.*, Del.Ch., C.A. No. 8282, 1990 WL 109243, Chandler, V.C. (Aug. 1, 1990) (no discussion), *aff'd*, Del. Supr., 588 A.2d 255 (1991) (no discussion); *Pinson v. Campbell–Taggart, Inc.*, Del.Ch., C.A. No. 7499, 1989 WL 17438, Jacobs, V.C. (Feb. 28, 1989; revised, Apr. 21, 1989, Aug. 11, 1989, & Nov. 28, 1989) (no discussion).

96. *Gonsalves v. Straight Arrow Publishers, Inc.*, Del.Supr., 725 A.2d 442 (1999) Order at 10 (emphasis added).

97. *Le Beau,* at 29–30 (emphasis added).

98. *See* note 95 *supra.*

99. *See Rapid–American Corp. v. Harris*, Del. Supr., 603 A.2d 796, 809 (1992).

100. *See Gonsalves, Hintmann, Le Beau,* and *Grimes, supra* note 86.

101. *See* cases cited in note 95 *supra,* as well as *Tad's* and *TV58, supra* note 86. *But see Paskill Corp. v. Alcoma Corp.*, Del.Ch., C.A. No. 16221, 1999 WL 438832, Steele, V.C. (June 16, 1999) (awarding simple interest, noting that petitioner relied upon 11 percent

that it has displaced. Indeed, it is my opinion that the primary reason so many Chancery decisions *after* 1987 routinely awarded simple interest is a function of judicial inertia—that is, simple interest was the form of interest the Court had always granted in appraisal proceedings. But that hardly qualifies as a *reasoned* determination of the form and rate of interest that will fairly compensate dissenting shareholders for the extended loss of use of their money. Nor did reliance on this historical practice of awarding simple interest accurately reflect the appraisal statute's goal of preventing the respondent corporation from retaining unjust benefits from the use of the dissenting shareholders' funds. The rule or practice of awarding simple interest, in this day and age, has nothing to commend it—except that it has always been done that way in the past. And on that score, I side with Holmes: "It is revolting to have no better reason for a rule of law than that so it was laid down in the time of Henry IV. It is still more revolting if the grounds upon which it was laid down have vanished long since, and the rule simply persists from blind imitation of the past." [102] In Delaware, no rule of simple interest exists in the General Corporation Law and, to the extent a rule has developed in our case law, it is time to put an end to it. The grounds for the rule of simple interest are at best the inability of a prudent investor to receive compound interest and are at worst a blind adherence to the past.

Unless Section 262(i) is changed to *require* the awarding of compound interest, however, our General Corporation Law, for now, requires the Court of Chancery, in the exercise of its discretion, to choose between simple or compound. It is a decision committed by statute to this Court's discretion. One might reasonably wonder how that discretion should be exercised when parties in an appraisal case have not introduced *any* evidence regarding the investment return of the litigants. [103] I submit that it is entirely proper in such cases for this Court to draw the inferences I have drawn, based on the indisputable realities of the financial market, based on the Court's assessment of the relative financial sophistication of the parties, and based on common sense.

## III. UNFAIR DEALING CLAIM

Counterclaimants also seek judgment on their claim that the Cash–Out Mergers were the result of unfair dealing by Counterclaim Defendants. They divide their claim into three parts: (1) the timing and disclosure of the Cash–Out Mergers was designed to, and did, prevent the minority shareholders from receiving fair value; (2) the structure of the Cash–Out Mergers was designed to, and did, prevent the minority shareholders from receiving fair value, as Counterclaim Defendants did not provide certain pertinent information to Hempstead; and (3) the Counterclaim Defendants' failure to ascribe any value to the derivative litigation filed by Counterclaimants depressed the value of OTI and the Eight Centers. I address each of these claims in turn.

(simple) discount rate for corporation's largest asset to reflect corporation's cost of capital and denying request for 11 percent compound interest).

**102.** Oliver Wendell Holmes, *The Path of Law* 187 (1921).

**103.** In point of fact, very few, if any, appraisal trials provide a record on which the trial judge may base his compound versus simple interest decision. The parties usually fail (or refuse) to address this miniscule issue. That should not be surprising. After spending days, or even weeks, in a trial, wading through swarms of hired experts and hours of excruciating testimony, the trial judge, the parties, and counsel are determined to get it over as quickly as possible—which means no one wants to prolong the trial by even a minute in order to have yet more testimony on an issue like simple or compound interest. After two or three weeks of trial, it is inhumane to expect the trial judge to plead for yet another bucket of water to be added to the ocean.

*A. Law of an Unfair Dealing Claim*

 Our law allows a plaintiff in a cash-out merger to file, in addition to an action for appraisal, a claim for violation of entire fairness by the corporation or its board of directors. While an appraisal claim is based in statute, an unfair dealing claim is based in case law.[104] Such a claim consists of two elements, unfair dealing and unfair price, also known as procedural fairness and substantive fairness, respectively.[105] Both of these aspects of fairness have to be met for a board's decision to be found entirely fair to the minority shareholders. The burden of proof on these two issues is with the plaintiff where the board of the company being sued is disinterested in the transaction, and it is with the defendant where the board is interested.

With regard to the complicated interplay between an appraisal action and an unfair dealing claim, Vice Chancellor Jacobs made the following observation in *Nebel v. Southwest Bancorp, Inc.:*[106]

Claims based on fraud or breach of the fiduciary duty of disclosure cannot be adequately addressed in an appraisal, for the additional reason that non-disclosures of material facts might warrant injunctive relief that would prevent the merger from taking place. To say it differently, disclosure-based claims cannot be resolved in an appraisal proceeding because the appropriate remedies for disclosure violations (such as rescission or its monetary equivalent) are inconsistent with the purely monetary relief that is available in a statutory appraisal.[107]

 Therefore, Counterclaimants must show damages in excess of the fair value I have awarded in the appraisal action. In other words, if Counterclaimants cannot show the alleged unfair dealing by Counterclaim Defendants resulted in damages in excess of the $16,195,258 I have awarded them, less the $6,040,000 they were offered in the Cash–Out Mergers, or $10,155,258, they will essentially fail to receive any additional damages as a result of their unfair dealing claim.[108]

---

**104.** *See, e.g., Ryan v. Tad's Enters., Inc.,* Del. Ch., 709 A.2d 682 (1996), *aff'd,* Del.Supr., 693 A.2d 1082 (1997); *Cede & Co. v. Technicolor, Inc.,* Del.Supr., 634 A.2d 345 (1993); *Rabkin v. Philip A. Hunt Chem. Corp.,* Del.Supr., 498 A.2d 1099 (1985); *Weinberger v. UOP, Inc.,* Del.Supr., 457 A.2d 701 (1983).

**105.** *See Weinberger,* 457 A.2d at 711.

**106.** Del.Ch., C.A. No. 13618, 1999 WL 135259, Jacobs, V.C. (Mar. 9, 1999).

**107.** *Id.* at 11.

**108.** It is hard for me to see how Counterclaimants here (or plaintiffs in any appraisal/unfair dealing case) can show that the unfair dealing hurt the shareholders by more than the fair value of the company less the amount offered for their shares, especially considering the Supreme Court's statement in *Weinberger v. UOP, Inc.,* that "in a non-fraudulent transaction we recognize that price may be the preponderant consideration outweighing other features of the merger." *Weinberger,* 457 A.2d at 711. The Supreme Court described the factors inherent in fair dealing versus fair price and said they must be addressed together. But where claims for unfair dealing do not rise to the level of fraud—

and here there is no claim by Counterclaimants that it did—the Court should primarily focus on whether the price was unfair.

Consider this example: If this Court determines that a company has a fair value of $100 million and the company has offered $5 million in a cash-out merger to a ten per cent shareholder, the Court will award the shareholder an additional $5 million in an appraisal action. Now, assume that the shareholder has also filed a claim for unfair dealing, asserting that the company was really worth $150 million, but the timing of the merger was such that the majority shareholder captured all of the additional value once he cashed out the minority shareholders. The problem, it seems to me, is that the Court has already determined the value of the company to be $100 million, so why now should a minority shareholder be allowed to assert a separate claim for unfair dealing? The shareholder's unfair dealing claims should be factored into the price that the Court has determined in the appraisal action. And the unfair price claims, or substantive fairness claims, are almost by definition included in the appraisal value determined by the Court. *See Coates: Fair Value, supra* note 39 at 1260–62 & n. 33. *But see id.* at 1262 n. 34.

### B. Analysis of the Present Unfair Dealing Claim

Counterclaim Defendants have conceded the interestedness of the OTI board of directors. Therefore, Counterclaim Defendants bear the burden of proving that they did not engage in unfair dealing, or if they did, that the damages resulting from the unfair dealing do not exceed the amount I have awarded as fair value in the appraisal portion of this case less the amount offered to Counterclaimants as a result of the Hempstead Valuation.

#### 1. Timing and Disclosure of the Cash–Out Mergers

■ Counterclaimants allege that "the timing and disclosure of the Cash Out Mergers was designed for the sole purpose of permitting Colkitt to reap for himself the total value of the consideration already offered to him by EquiVision." [109] In other words, Colkitt was able to profit from the EquiMed Transaction while Counterclaimants were blocked out of it. My fair value determination on the appraisal claim has factored in the EquiMed Transaction, however, and so I cannot find that any aspect of value related to the timing or disclosure of the Cash–Out Mergers has had any negative effect on the valuation of the Eight Centers that has not been captured already in my appraisal of the Eight Centers.

#### 2. Structure of the Cash–Out Mergers

Counterclaimants argue that "Colkitt and Caravan, with the unwitting assistance of Hempstead, structured the Cash Out Mergers to ensure that the value of the 8 Spin–Off Corporations offered through the Cash Out Mergers was extraordinarily depressed." [110] Specifically, Hempstead was not apprised of the EquiMed Transaction or the existence of the derivative claims. I believe, however, that my valuation above has undone any influence Hempstead's ignorance as to the EquiMed Transaction's occurrence may have had on the valuation by specifically including it as a factor in determining the fair value of the Eight Centers. With regard to the derivative claims, I address them below. Thus, I see no additional value here that would lead me to believe the unfair dealing claim may exceed the appraisal's fair value calculation.

#### 3. Failure to Ascribe Any Value to the Derivative Claims

■ Counterclaimants contend that the three derivative suits filed against Colkitt and two other directors of OTI, for diversion of revenue, exorbitant management fees, and exorbitant lease rates paid to Colkitt's parents, should have been revealed to Hempstead and factored into any valuation of OTI and the Eight Centers. They cite their expert, Grover C. Brown, as having placed a $19,707,217 value on these derivative claims. Counterclaim Defendants' expert, Professor Lawrence Hamermesh, disagreed, pointing out that Brown (a) did not discount the claims for likelihood of success but rather valued them as if they would be winners, and (b) did not factor into his analysis litigation by Integra Bank against OTI which would significantly or entirely offset any derivative claims by shareholders. Hamermesh's valuation subtracted out (a) the likelihood that the claims would fail, (b) the attorneys' fees that would need to be paid, and (c) any indemnification OTI would have to its board members. Hamermesh's conclusion, after further subtracting out the value of Integra Bank's claim against OTI, was that the net contingent value of all claims was a *negative* $2.5 million. Because this Court has previously held that "there would be strong logic in including the *net* settlement value of such claims as an asset of the corporation for appraisal purposes," subtracting "attorneys' fees ...

---

**109.** Counterclaimants' Post–Tr. Br. at 70.

**110.** *Id.* at 71.

from any estimated value," [111] I find both strong case law and even stronger intuitive support for Hamermesh's view that *all* litigation must be factored in, and all defenses against it must be considered, in determining the value of contingent claims. Accordingly, I do not find any additional value that should be ascribed to the Eight Centers as a result of the derivative litigation against OTI's directors.[112] I also, however, do not find Counterclaim Defendants have borne their burden of proving that the valuation of the claims should be a *negative* $2.5 million. Therefore, I find that the contingent litigation amount that should be added to the valuation is $0.

### 4. *Summary of Unfair Dealing Claim*

The unfair dealing claims are a hybrid of procedural and substantive unfair dealing. I do not find that any of Counterclaimants' claims of unfair dealing add any potential value to the fair value I have determined in the appraisal section of this Opinion.[113] I also, however, do not find that Counterclaim Defendants have proven that any of these claims are worth *less* than the fair value I have determined through the appraisal process. Therefore, I find the value of Counterclaimants' unfair dealing claims to be equal to the § 262 fair value

of the Eight Centers, less the $6,040,000 offered to Counterclaimants as a result of the Hempstead Valuation. In other words, I find the Counterclaim Defendants dealt unfairly with the Counterclaimants, and the amount of damages equals the fair value I have determined above less the $6,040,000 offered.

## IV. BREACH OF CONSENT DECREE CLAIM

█ Counterclaimants' final claim is that Counterclaim Defendants breached the Consent Decrees provisions concerning Colkitt's right to purchase the treatment centers. I base my holding on this claim on the fact that the Consent Decree explicitly grants Colkitt an *option* to purchase the cancer treatment centers. It does not *require* him to do so and, in any event, reading the alleged intent of the parties into the interpretation of the contract (as Counterclaimants would have me do) when that intent contradicts the stated language of the contract is not an accepted method of contract interpretation.[114] Specifically, the Consent Decree provides that "Colkitt, his agents, associates, affiliate companies, or designee, shall have the *option to purchase* the fifteen (15) cancer treatment centers owned by Onco Tech . . . ." [115]

**111.** *Gonsalves v. Straight Arrow Publishers, Inc.*, Del.Ch., C.A. No. 8474, 1996 WL 483093, Allen, C. (Aug. 22, 1996), Mem. Op. at 2–3 & n.1 (emphasis added).

**112.** Although I find the net derivative litigation value is zero, that does not mean I cannot find the fee for collected revenue to be forty percent, presumably one of the goals of the derivative litigation—while I essentially find that no damages are appropriate for *past* harms, I believe one result of the derivative suit would be the *future* adjustment of collected revenue to reflect a forty percent fee. *See supra* pages 916–18.

**113.** I am not certain that a purely procedural unfair dealing claim *could* add any value, especially considering that a Court's appraisal should encompass elements of value that were denied the plaintiff by the defendant's

unfair procedure, such as the timing of the merger. *See, e.g., Kumar v. Racing Corp. of Am.*, Del.Ch., C.A. No. 12039, 1991 WL 67083, Berger, V.C. (Apr. 26, 1991), Mem. Op. at 10 ("The timing of a merger constitutes unfair dealing when (1) the minority stockholders are financially injured by the timing and (2) the controlling stockholder gains from the transaction what the minority lost."). If that is true, then I do not understand how or why the Court cannot calculate, as an aspect of its appraisal analysis, the "value" that the majority shareholder extracted from the minority. The appraisal process should fairly capture the elements of value that were taken from the dissenting minority.

**114.** *See, e.g., Gallagher v. Fidelcor, Inc.*, 441 Pa.Super. 223, 657 A.2d 31, 33 (1995), *appeal denied*, 544 Pa. 675, 678 A.2d 365 (1996).

**115.** Consent Decree at 25 (emphasis added).

Nothing else in the Consent Decree requires Colkitt to purchase the centers.

Furthermore, Counterclaimants bear the burden of proving their breach of contract claim, and I do not find that they have met that burden. All five cases they cite for the proposition that this Court should broaden the definition of the word "purchase" to include a merger interpret the word "seller" under the Securities Exchange Act of 1934 and under Rule 10b–5.[116] The SEC and the courts, of course, have always defined words such as "purchase," "sell," "purchaser," and "seller" very broadly. That does not mean Pennsylvania law, which is the law that should govern the Consent Decree since it was entered into as a result of litigation in that state, does the same, and Counterclaimants have cited no cases to demonstrate that it does.

Counterclaimants are correct that the cases cited by Counterclaim Defendants to show that a cash-out merger is not a purchase[117] are not "on all fours" with this matter. It seems to me that a cash-out merger is more similar to a purchase of a company than it is to a sale of assets, as the *Rothschild* and *Jones' Estate* cases consider. Both Delaware and Pennsylvania law do, however, treat a merger differently from the sale of a company, and so I decline to say that the Cash–Out Mergers are actually a purchase of the company as contemplated in the Consent Decree. But in any event, Counterclaimants have not met the burden of proving that the intent

of the parties overruled the actual language of the Consent Decree nor that the option to purchase turns into an *obligation* in the event of a merger. Thus, I find this claim lacking in substance and dismiss it for failure to state a claim upon which relief may be granted.

## V. CONCLUSION

For the reasons set forth above, judgment will be entered in favor of Counterclaimants and against Counterclaim Defendants in the amount of $16,195,258, plus prejudgment interest calculated at the rate of 0.86% per month, compounded monthly, from August 30, 1995 to the date of payment. Costs of this litigation are assessed against Counterclaim Defendants. Counterclaimants shall elect whether the judgment shall be for the fair value determined under § 262 or for the unfair dealing claims.

Counsel should confer and submit a form of order that implements this decision.

**116.** *Dudley v. Southeastern Factor & Fin. Corp.*, 446 F.2d 303, 306–07 (5th Cir.), *cert. denied sub nom. McDaniel v. Dudley*, 404 U.S. 858, 92 S.Ct. 109, 30 L.Ed.2d 101 (1971); *Dasho v. Susquehanna Corp.*, 380 F.2d 262, 266–67 (7th Cir.), *cert. denied sub nom. Bard v. Dasho*, 389 U.S. 977, 88 S.Ct. 480, 19 L.Ed.2d 470 (1967); *Vine v. Beneficial Fin. Co., Inc.*, 374 F.2d 627 (2d Cir.1967); *Issen v. GSC Enters., Inc.*, 508 F.Supp. 1278 (N.D.Ill.

1981); *Voege v. American Sumatra Tobacco Corp.*, 241 F.Supp. 369, 374 (D.Del.1965).

**117.** *See Rothschild Int'l Corp. v. Liggett Group, Inc.*, Del.Ch., 463 A.2d 642, 646 (1983) (addressing a sale of corporate assets); *In re Jones' Estate*, 377 Pa. 473, 105 A.2d 353 (1954) (stating "a merger of two corporations cannot be considered as a sale of their property by the constituent companies").